UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
NASHEEN STROUD,                      : 13 Civ. 3251 (AT) (JCF)
                                     :
          Plaintiff,                 :          REPORT AND
                                     :       RECOMMENDATION
     - against -                     :
                                     :
COMMISSIONER OF SOCIAL SECURITY      :
ADMINISTRATION,                      :
                                     :
          Defendant.                 :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE ANALISA TORRES, U.S.D.J.:

     Plaintiff Nasheen Stroud brings this action under sections
405(g) and 1383(c)(3) of the Social Security Act (the "Act"), 42
U.S.C. §§ 405(g), 1383(c)(3), seeking review of a determination of
the Commissioner of Social Security (the "Commissioner") denying
her applications for Supplemental Social Security Income and
Disability Insurance Benefits.  The parties have submitted cross-
motions for judgment on the pleadings under Rule 12(c) of the
Federal Rules of Civil Procedure.  For the reasons that follow, I
recommend denying the Commissioner's motion, granting the
plaintiff's motion, and remanding the case to the Commissioner.

Background

     A.   Personal History

     Ms. Stroud was born in 1979 and, on the alleged disability
onset date of December 14, 2010, was 31 years old.  (R. at 109).[1]
She lives with her mother and adult sister in an apartment.  (R.
at 37).  She earned a GED in 2009 and reported past work as a

_____

     [1] "R." refers to the Administrative Record filed with the
Commissioner's Answer.

1

hairstylist, babysitter, supermarket cashier, phone operator, and recreational therapist.  (R. at 38-40, 114).  She reports a number of complaints related to diabetes mellitus and neuropathy in her hands.  (Complaint, ¶ 4; R. at 41-42).

    B.   <u>Medical History</u>

        1.   <u>January 5, 2010 to December 8, 2010</u>

Megan Collins, M.D., examined Ms. Stroud on January 5, 2010. (R. at 207).  She recorded that the plaintiff was five feet, four inches tall and weighed 216 pounds.  (R. at 207).  Ms. Stroud reported having low blood sugar that morning, which became high after she drank a glass of orange juice.  (R. at 207).  Her peripheral pulses were 2+ on the right side, but Dr. Collins could not feel the pulse on the left side.  (R. at 207).  Dr. Collins diagnosed "[d]iabetes with ketoacidosis,[2] type 1 [juvenile type], not stated as uncontrolled" and "trigger finger," and referred her to an ophthalmologist.  (R. at 207).  Dr. Collins saw the plaintiff again on March 17, 2010, where she again assessed type 1 diabetes with ketoacidosis, as well as an unspecified vitamin D deficiency. (R. at 200).  Ms. Stroud's weight had increased slightly to 220 pounds. (R. at 200).  Dr. Collins recommended that Ms. Stroud continue alcohol swabs, as well as subcutaneous Novolog solution

---

[2] Diabetic ketoacidosis occurs when, because of an insulin deficiency, the body cannot use glucose as a fuel source, and so instead uses fat, which produces, as a by-product, ketones.  High levels of ketones in the blood and urine are toxic.  Diabetic Ketoacidosis, Medline Plus, a Service of the U.S. National Library of Medicine, National Institutes of Health, <u>available at</u> http://www.nlm.nih.gov/medlineplus/ency/article/000320.htm (last visited Aug. 14, 2014).

three times daily and subcutaneous Lantus solution once daily. (R. at 200). For the vitamin D deficiency, she prescribed Ergocalciferol and vitamin D tablets.[3] (R. at 200). Dr. Collins also referred Ms. Stroud to an endocrinologist. (R. at 200).

On July 16, 2010, Dr. Collins noted the plaintiff's weight at 223 pounds, and found that she was pleasant, alert, and well-nourished. (R. at 157). Ms. Stroud had a normal pharynx and tonsils; no lesions in her oral cavity; a supple neck with no lymphadenopathy; regular heart rate and rhythm; clear lungs; a peripheral pulse of 2+; and no tinea or callusses on her feet. (R. at 157). She diagnosed type 1 diabetes with ketoacidosis and noted that Ms. Stroud's glucose was well-controlled. (R. at 157).

Ms. Stroud visited Dr. Collins again on October 22, 2010, and December 8, 2010. At both visits, Dr. Collins diagnosed type 1 diabetes mellitus, noting it was controlled; carpal tunnel syndrome; and unspecified vitamin D deficiency. (R. at 159, 161). She was also diagnosed with a urinary tract infection in December. (R. at 161). Ms. Stroud's weight was stable, 221 pounds in October and 222 pounds in December. (R. at 159, 161). Examination of the plaintiff's extremities revealed that she had no thenar atrophy in the right hand and her hand grip was 5/5. (R. at 159, 161). In October, flexing of her wrists caused numbness of all fingers

---

[3] The medical records from January 5, 2010, and March 17, 2010, were not among the records submitted to the Administrative Law Judge ("ALJ"), but were submitted in connection with Ms. Stroud's appeal of the ALJ's decision to the Appeals Council. (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Memo."), at 10-11; Plaintiff's Memorandum of Law ("Pl. Memo.") at 3 n.2).

except the fourth; this is not mentioned in the notes from December. (R. at 159, 161). A foot exam in December showed normal circulation and "monofilament sensation to vibration intact." (R. at 161).

2.   December 19, 2010 to January 19, 2012

The first medical record submitted from the period after Ms. Stroud's alleged disability onset date is a December 19, 2010 report from an eye examination by Eli Marcovici, M.D., which diagnoses diabetes mellitus without retinopathy and recommends another visit in one year. (R. at 163).

Referred by the New York State Division of Disability Determinations, the plaintiff visited internist Robert Dickerson, D.O., for a consultative examination on March 24, 2011. (R. at 150). Dr. Dickerson noted her height as five feet, five inches and her weight as 226 pounds. Ms. Stroud reported that she cooked, did laundry, and shopped once per week; groomed herself daily; and watched television, listened to the radio, and socialized with friends in her leisure time. (R. at 151). Her general appearance, gait, and station were normal and unrestricted. (R. at 151). Dr. Dickerson found no abnormality in her skin, lymph nodes, head, face, eyes, ear, nose, throat, neck, chest, lungs, heart, abdomen, neurology, or extremities. (R. at 151-52). Ms. Stroud had full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally in her cervical spine and lumbar spine; no abnormality in her thoracic spine; and full range of motion bilaterally in her hips, knees, ankles, shoulders, elbows,

4

forearms, and wrists.  (R. at 152).  Dr. Dickerson detected no subluxations, contractures, ankylosis, thickening, redness, heat, swelling, or effusion.  (R. at 152).  Ms. Stroud's joints were stable and nontender.  Although her hand and finger dexterity was intact and her grip strength 5/5 bilaterally, Phalen's test[4] -- a diagnostic tool for carpal tunnel syndrome -- was positive for her right hand.  (R. at 152).  Dr. Dickerson diagnosed Ms. Stroud with type 1 diabetes, arthritis with no range of motion restriction, and possible carpal tunnel syndrome on her right side.  (R. at 153). He stated that she was mildly restricted for manual inspection on her right side, unrestricted on her left, and "unrestricted for any other physical activity."  (R. at 153).

On April 4, 2011, Dr. Collins examined Ms. Stroud, noting that she complained of numbness in her right forearm and the first three fingers of her right hand, but had not seen a neurologist.  (R. at 164).  Dr. Collins reported the plaintiff's weight as 228 pounds and noted nothing abnormal in her appearance, oral cavity, lungs, heart, or feet.   (R. at 164).  Her diagnosis was type 1 diabetes with ketoacidosis not stated as uncontrolled, carpal tunnel syndrome, and unspecified vitamin D deficiency.   (R. at 164). Dr. Collins referred Ms. Stroud to an endocrinologist and a neurologist.  (R. at 165).

A medical record from endocrinologist Edward Colt, M.D., dated May 4, 2011, noted that Ms. Stroud's ophthalmic examination of

---

[4] The report identifies the test as "Phelan's test."  (R. at 152).

December 2010 showed no retinopathy; that her last PAP smear, in September 2009, was normal; and that her current medications included Lantus solution, Novolog solution, and vitamin D tablets.[5] (R. at 211).  After a May 23, 2011 examination he diagnosed her with type 1 diabetes, uncontrolled but "without mention of complication," and unspecified obesity.  (R. at 170).  He prescribed a high-dosage vitamin D capsule, reduced the amount of Ms. Stroud's Lantus solution prescription, and counseled her to lose weight through a low cholesterol diet and to walk 20 blocks per day.  (R. at 171).

Dr. Collins' progress notes for Ms. Stroud's July 18, 2011 visit indicate that her diabetes was not currently controlled.  (R. at 174).  The plaintiff weighed 226 pounds and had no chest pain, vomiting, diarrhea, shortness of breath, or cough.  (R. at 174).  The diagnosis was uncontrolled type 1 diabetes.  (R. at 175).  Dr. Collins referred Ms. Stroud to a diabetes group education class, a nutrition clinic, and another endocrinologist.  (R. at 175).

Dr. Collins again noted that Ms. Stroud's diabetes was uncontrolled in her August 16, 2011 progress notes.  (R. at 177).  At that visit, the plaintiff reported a thiamine deficiency.  (R. at 177).   Her weight had decreased to 220 pounds.  (R. at 177).  Dr. Collins assessed Ms. Stroud with uncontrolled type 1 diabetes without mention of complication and "other and unspecified manifestations of thiamine deficiency," noting that she would

---

[5] This record was first submitted to the Appeals Council. (Def. Memo. at 10).

6

require 100 micrograms of thiamine four times per week.  (R. at
177-78).

Endocrinologist Jeanine Albu, M.D., examined Ms. Stroud on
September 28, 2011, pursuant to Dr. Collins' reference.  (R. at
191).  She noted that Ms. Stroud was severely obese and had
suffered diabetic ketoacidosis three times.  (R. at 191).  She
diagnosed Ms. Stroud with uncontrolled type 1 diabetes mellitus and
acute sinusitis, ordering a follow-up in three months.  (R. at
191).

On November 4, 2011, Dr. Collins noted the plaintiff's weight
to be 216 pounds.  (R. at 194).  She conducted a depression
screening and found no evidence of depression.  (R. at 193).  Ms.
Stroud reported no chest pain, edema, palpitations, or shortness of
breath with exertion.  (R. at 194).  She also had no nausea,
vomiting, diarrhea, fever, loss of appetite, dysuria, or cough.
(R. at 194).  She asserted that she had low blood sugar rarely --
less than once per week.  (R. at 194).  Her extremities showed no
edema, her feet had no ulcers or tinea, and her peripheral pulses
were 2+ bilaterally.  (R. at 194).  Dr. Collins' diagnosis was type
1 diabetes mellitus without mention of complication, not stated as
uncontrolled.  (R. at 194).  Ms. Stroud was referred to Dr.
Marcovici for an eye examination (R. at 194), which found
nonproliferative diabetic retinopathy in both eyes[6] (R. at 206).
Dr. Marcovici recommended a follow-up in six months.  (R. at 206).

---

[6] Dr. Marovici's December 20, 2011 report was first submitted
to the Appeals Council.   (Def. Memo. at 10).

Neurologist Ritesh Ramdhani, M.D.,[7] filled out a "Treating Physician's Wellness Plan Report" for the Human Resources Administration's public assistance program on January 18, 2012. (R. at 188-89).   He diagnosed Ms. Stroud with carpal tunnel syndrome on her right side, noting that an EMG was needed to assist with the diagnosis.   (R. at 188-89).   He also noted that the plaintiff had decreased sensation in her hands and fingers.   (R. at 188).   Further, he checked a box on the form indicating that Ms. Stroud was "[u]nable to work for at least 12 months (may be eligible for long term disability benefits)."   (R. at 189).

On January 19, 2012, Ms. Stroud visited Dr. Collins "mostly to have disability forms filled out" for diabetes and carpal tunnel syndrome.   (R. at 195).   Dr. Collins reported that Ms. Stroud's diabetes was controlled, stated that she did not think Ms. Stroud was disabled by the diabetes, and indicated that any opinion on carpal tunnel syndrome should come from a neurologist.   (R. at 195).   However, the progress note indicates that Dr. Collins referred Ms. Stroud to a diabetes educator on account of "poorly controlled diabetes."   (R. at 196).

A "Multiple Impairment Questionnaire" filled out by Dr. Collins on that same date diagnoses Ms. Stroud with uncontrolled type 1 diabetes mellitus, noting low sensation in both of Ms. Stroud's hands and fingers, and carpal tunnel syndrome.   (R. at 180).   She listed Ms. Stroud's primary symptoms as decreasing

_____

[7] The ALJ read the doctor's signature as "Pitish Ramdah, M.D." (R. at 28).   The plaintiff calls him "Pitesh Ramdhan, M.D." (Pl. Memo. at 5).

sensation in her hands, upper neck pain, frequent hypoglycemia, and depression, noting that the plaintiff complained of a tingling sensation and constant pain that travels up her arm to her neck. (R. at 181-82).  Her level of pain was estimated at eight on a ten-point scale, and her fatigue at nine on a ten-point scale.  (R. at 182).  Assessing Ms. Stroud's functional capacity, Dr. Collins reported that she could sit for two hours of an eight-hour day and stand or walk for up to one hour, and that she should move around for 15 to 30 minutes every 30 minutes to one hour.  (R. at 182-83).  Ms. Stroud could lift 0-5 pounds occasionally, but never anything heavier, and could not carry even zero to five pounds.  (R. at 183).  According to Dr. Collins, Ms. Stroud had "marked" limitation in grasping, turning, and twisting objects, and in using her fingers or hands for fine manipulations, and moderate limitations in using her arms for reaching.  (R. at 183-84).  Dr. Collins opined that Ms. Stroud's symptoms would increase if she were placed in a competitive work environment; that her condition interfered with her ability to keep her neck in a constant position and her ability to concentrate; that she could not perform a full-time competitive job that required activity on a sustained basis; and that she could tolerate only low work stress, because stress caused low blood sugar.  (R. at 184-85).  She also had psychological limitations.  (R. at 185-86).  Her condition was expected to last at least 12 months.  (R. at 185).

C.  <u>Procedural History</u>

ALJ Kenneth G. Levin held a hearing on February 6, 2012.  Ms.

Stroud, who was represented by an attorney at the hearing, testified that she had constant tingling in her hands -- trouble with her right hand had caused her to stop working as a hairstylist -- which sometimes extended up to her shoulder. (R. at 38, 41). At the recommendation of a neurologist, she had scheduled an EMG later in the month of February. (R. at 43). When she had low blood sugar, which made her dizzy, disoriented, and caused her to sweat, she ate food with sugar to alleviate these symptoms. (R. at 41). Sometimes she overcompensated by eating too much candy, requiring her to take insulin. (R. at 42). She reported that she could walk up to ten blocks and stand for 45 minutes at a time. (R. at 45). Back pain limited her sitting to 30 minutes; however, she testified that she had not sought treatment for her back pain. (R. at 45). She could lift but not carry up to five pounds. (R. at 46). Ms. Stroud further testified that she did not do housework other than cleaning her room and that she slept most of the day, but was unable to sleep through the night because low blood sugar would awaken her. (R. at 46-47). She did, however, socialize with friends when they came over, and exercised by jogging and walking in place. (R. at 47).

The medical expert[8] testified that the records showed that Ms. Stroud had "type 1 juvenile type diabetes mellitus" and was insulin-dependent. (R. at 48). Although there was an episode of

---

[8] In the hearing transcript, the medical expert is identified as "Dr. Block." (R. at 34, 48). However, in the ALJ's decision, he is identified as "Charles Plotz, M.D.," an "internist/arthritis specialist." (R. at 24).

diabetic acidosis in 2006, her diabetes was otherwise "reasonably well controlled." (R. at 48). He commended the plaintiff for losing weight through dieting, but noted that she was still "obviously obese." (R. at 48-49). He noted that, because the muscle at the base of her thumb was not visibly atrophied, it was unlikely that she had severe carpal tunnel syndrome. (R. at 48-49). The medical expert stated that he would expect her to have no limit on sitting or fingering and handling; and that she should be able to stand and walk for six hours out of an eight-hour workday, and lift and carry up to 20 pounds primarily in her left hand with assistance from the right. (R. at 50).

In response to the ALJ's hypothetical question, the vocational expert[9] testified that jobs existed in the national economy in significant numbers for a person of Ms. Stroud's age, education, and prior work experience with the residual functional capacity set forth by the medical expert, except with the added limitation that she could only occasionally practice fine fingering with her right hand. (R. at 52-54). Specifically, such a person could work as a messenger, usher, marker, or surveillance system monitor. (R. at 54). When plaintiff's counsel modified the hypothetical, extending the fingering limitation to the left hand, the vocational expert testified that the work of a messenger, usher, or surveillance system monitor would still be available. (R. at 55). If the

_____

[9] The vocational expert is identified in the hearing transcript as "Ms. Pascrell." (R. at 34, 50). However, in the ALJ's decision, she is identified as "Melissa Fass Karlin." (R. at 24).

person's work were frequently disrupted so that she was "off task" up to 10% of the day, there would be no appropriate jobs. (R. at 56).

The ALJ denied Ms. Stroud's claim on February 22, 2014. She requested review by the Appeals Council, which denied the request on March 12, 2013. (R. at 1-6).

Discussion

A.   Standard of Review

A federal court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009) (internal quotation marks omitted); see also Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009); Bonet v. Astrue, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008). Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the decision was supported by substantial evidence. Tejada, 167 F.3d at 773; Calvello, 2008 WL 4452359, at *8.

Substantial evidence in this context is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hahn, 2009 WL

1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); accord Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21; see also Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999). "If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result." Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006); see Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

A claimant is disabled under the Act and therefore entitled to benefits if she can demonstrate that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Hahn, 2009 WL 1490775, at *6; Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000). The disability must be of "such severity that [the claimant] is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of

13

substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has created a five-step sequential analysis for evaluating disability.   20 C.F.R. § 404.1520.   First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i), (b).   Next, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities."   20 C.F.R. § 404.1520(c); see 20 C.F.R. § 404.1520(a)(4)(ii).   Third, if the impairment meets the duration requirements and is listed in 20 C.F.R. § 404, Subpart P, Appendix 1 or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.   20 C.F.R. § 404.1520(a)(4)(iii), (d).   If, however, the claimant's impairment is neither listed nor equal to any listed impairment, she must prove that she does not have the residual functional capacity to perform her past work.   20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); Longbardi, 2009 WL 50140, at *23 (quoting Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996)). Finally, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.   20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi, 2009 WL 50140, at *23.

At each stage of the analysis, the ALJ "must adequately explain his analysis and reasoning in making the findings on which

his ultimate decision rests, and must address all pertinent evidence." Delacruz v. Astrue, No. 10 Civ. 5749, 2011 WL 6425109, at *8 (S.D.N.Y. Dec. 1, 2011); see also Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (requiring "the crucial factors in any determination [] be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence"); Pacheco v. Barnhart, No. 03 CV 3235, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (remanding where ALJ failed to "adequately explain which evidence she was considering (and rejecting)").   "It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of his reasoning to permit the reviewing court to judge the adequacy of his conclusions." Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991).   "[A]n ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Calzada v. Asture, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (internal quotation marks omitted).

B.   ALJ's Decision

The ALJ determined that Ms. Stroud had not engaged in substantial gainful activity since December 14, 2010, and that she suffered from a severe combination of impairments: insulin-dependent diabetes mellitus, mild to moderate obesity, and possible carpal tunnel syndrome in her right hand.   (R. at 30).   Her impairments did not meet or medically equal a listed impairment. (R. at 30).

Finding the plaintiff "not a particularly credible witness,"

15

the ALJ agreed that she had the residual functional capacity outlined by the medical expert at the hearing: no limits on sitting or fingering and handling; ability to stand and walk for six hours out of an eight-hour workday; and ability to lift and carry up to 20 pounds primarily in her left hand with assistance from the right. (R. at 29-30, 50). Given this functional capacity, the ALJ found, at step four, that Ms. Stroud could perform her past relevant work as a telephone operator, meaning she was not disabled. (R. at 30).

The ALJ then found that, even assuming that carpal tunnel syndrome compromised the plaintiff's ability to perform work that required more than occasional fingering, there were jobs in the national economy in significant numbers that she could perform, specifically, messenger, usher, marker, and surveillance system operator. (R. at 30). Thus, he found, in the alternative, that Ms. Stroud was not disabled at step five. (R. at 30).

    D.   <u>Plaintiff's Arguments</u>

       1.   <u>Opinion of Dr. Rhamdani</u>

Ms. Stroud first argues that the ALJ erred in his consideration of Dr. Rhamdani's Wellness Plan Report. According to the plaintiff, the ALJ considered and dismissed the neurologist's report in one sentence: "Although he was unwilling to say more without an EMG, he did check the box that she could not work for 12 months." (Pl. Memo. at 11; R. at 28). This is insufficient, she contends, because the ALJ did not explain the weight that he gave to the report or determine whether the opinion was supported by the

record.  (Pl. Memo. at 11-13).  Indeed, the plaintiff asserts that
"it is [] unclear whether [the ALJ] considered [the opinion] in
rendering his decision."  (Pl. Memo. at 13).  As the Commissioner
points out, this is both factually and legally incorrect.
(Memorandum of Law in Opposition to Plaintiff's Motion for Judgment
on the Pleadings and in Further Support of the Commissioner's
Motion for Judgment on the Pleadings ("Reply") at 3-5).

    The ALJ considered Dr. Ramdhani's report in connection with
other evidence in the record.  He noted the plaintiff's repeated
tentative diagnoses of carpal tunnel syndrome and the neurologist's
recommendation that she have an EMG to aid in diagnosis.  (R. at
29).  He further found that, although she had a positive Phalen's
test, the medical expert noted that there was no thenar atrophy,
which indicated that any carpal tunnel syndrome in her right hand
was mild, at worst.  Moreover, the ALJ recognized Dr. Ramdhani's
diagnosis of carpal tunnel syndrome on her right side and, at step
five of the sequential analysis, assumed "right-sided CTS
prevent[ing] [Ms. Stroud] from work requiring more than occasional
fingering."  (R. at 30).  The fact that the ALJ did not credit Dr.
Ramdhani's opinion that the plaintiff was unable to work for at
least twelve months is of no moment -- indeed, as the plaintiff
recognizes, that issue is reserved to the Commissioner.  (Pl. Memo.
at 11); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (stating that
"[a] statement by a medical source that you are 'disabled' or
'unable to work' does not mean that we will determine that you are
disabled" because that determination is "reserved to the

Commissioner"); <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999) (even treating physician's opinion that claimant is unable to work is not determinative of disability).

The plaintiff also argues that the ALJ should have contacted Dr. Ramdhani after Ms. Stroud's scheduled EMG to allow him to bolster his opinion.  The law did not require the ALJ to follow-up with Dr. Ramdhani when he already had a report from the neurologist reflecting a medical opinion in connection with the plaintiff's visit.  <u>See</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.").  Indeed, the plaintiff emphasizes that Dr. Ramdhani "did not check the available box [on the form] that stated 'cannot determine; more information is needed.'" (Pl. Memo. at 13).  This implies that the neurologist's medical opinion was complete and based on sufficient information. Yet the plaintiff contends that the doctor's failure to check the box requiring more information supports her argument that the ALJ should have contacted Dr. Ramdhani to get more information about the diagnosis.  (Pl. Memo. at 13-14).  This argument is internally inconsistent.

   2.   <u>Opinions of Dr. Collins</u>

The plaintiff next asserts that the ALJ improperly evaluated Dr. Collins' opinion when he assigned no weight to her January 19, 2012 Multiple Impairment Questionnaire because her answers there

appeared inconsistent with her progress notes of the same date.
(Pl. Memo. at 14-15; R. at 29).  The plaintiff complains that the
ALJ did not follow the proper legal standard for determining
whether to give Dr. Collins' opinion "controlling weight" as the
opinion of a treating physician (Pl. Memo. at 15-16), that "the
basis for discounting [the] opinion was an unwarranted attack on
[Dr. Collins'] professional integrity" (Pl. Memo. at 16), and that
the ALJ should have sought clarification of the opinion rather than
dismissing it entirely (Pl. Memo. at 17).

The plaintiff is correct on this last point.  There is no
dispute that Dr. Collins was the plaintiff's treating physician --
a fact that the ALJ recognized.  (R. at 28).  A treating
physician's opinion should be given controlling weight as long as
it is supported by facts and not inconsistent with other
substantial evidence in the record.  Rosa, 168 F.3d at 78-79.  The
ALJ discounted Dr. Collins' opinion in the Multiple Impairment
Questionnaire because it seemed inconsistent with her other
treatment notes.  (R. at 29).  Specifically, Dr. Collins' progress
notes reflect that she did not think that the plaintiff's diabetes
was disabling and could not render an opinion regarding carpal
tunnel syndrome.  (R. at 29, 195).  The questionnaire, however,
reports severe effects from both diabetes and from carpal tunnel
syndrome, resulting in an extremely limited residual functional
capacity.  (R. at 29, 180-87).  Additionally, there is an
inconsistency between the progress notes, which fail to mention
upper neck pain and depression (although they do note that the

plaintiff was "feeling down"), and the questionnaire, which lists both among Ms. Stroud's "primary symptoms."  (R. at 29, 181).

"[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information . . . to fill any clear gaps before rejecting the doctor's opinion." Ureña-Perez v. Astrue, No. 06 Civ. 2589, 2009 WL 1726217, at *29 (S.D.N.Y. Jan. 6, 2009), report and recommendation adopted as modified, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).  Thus, where a treating physician's opinion is "out of sync with the treating notes, the ALJ [does] not have the luxury of terminating his inquiry at that stage in the analysis." Hidalgo v. Colvin, No. 12 Civ. 9009, 2014 WL 2884018, at *19 (S.D.N.Y. June 25, 2014) (internal quotation marks omitted).  Rather, the ALJ must further develop the record to resolve the inconsistency.[10]  Id.; see also Santiago v. Astrue, No. 11 Civ. 6873, 2012 WL 1899797, at *19

---

[10] The Commissioner notes that the regulation requiring the ALJ to request further information from a medical source where there is incomplete or contradictory information in the record has been eliminated.  (Reply at 11) (citing How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651-01 (Feb. 23, 2012) ("Disability Evidence")).   The ALJ's affirmative obligation to develop the record does not arise from a regulation, rather it "follows from the principle that a hearing on disability benefits is a non-adversarial proceeding." Ureña-Perez, 2009 WL 1726217, at *29 (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). Moreover, the regulation at issue was modified merely to allow the ALJ more flexibility in determining where to obtain the needed information: "[d]epending on the nature of the inconsistency or insufficiency, there may be other, more appropriate sources [than the claimant's medical source] from whom [the Commissioner] could obtain the information that [she] needs." Disability Evidence, 77 Fed. Reg. 10651-01 at 10651.  Thus, doing away with the rule does not mean that the ALJ is free to dismiss an inconsistency without further developing the record.

(S.D.N.Y. May 24, 2012) (remanding case where ALJ "never asked [the medical source] to explain the possible inconsistencies in his assessments").

Here, Dr. Collins' answers on the questionnaire were unquestionably inconsistent with her treatment notes. But the ALJ should have further developed the record in order to resolve the inconsistency.

### 3.    Plaintiff's Credibilty

The plaintiff contends that the ALJ's finding that the plaintiff's subjective complaints were "not particularly credible" was not supported by substantial evidence. (R. at 29; Pl. Memo. at 17).

Where an ALJ determines that the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (alteration in original) (quoting 20 C.F.R. § 404.1529(a)). "[W]hile an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he . . . is 'not require[d] to accept the claimant's subjective complaints without question.'" Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (second alteration in original) (internal citation omitted) (quoting Genier, 606 F.3d at 49).

If the plaintiff's statements about her symptoms "are not

substantiated by the objective medical evidence, 'the ALJ must engage in a credibility inquiry.'" Felix v. Astrue, No. 11 CV 3697, 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012) (quoting Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010)). In making a credibility determination, the ALJ must consider

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain or other symptoms; (5) any treatment, other than medication, the claimant has received; (6) any other measures the claimant employs to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain or other symptoms.

Kane v. Astrue, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013) (citing C.F.R. § 404.1529(c)(3)(i)-(vii)). The ALJ, however, is not required to discuss all of these factors "as long as the decision includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasoning for that weight." Felix, 2012 WL 3043203, at *8; see Campbell, 465 F. App'x at 7; Petrie ex rel. T.T. v. Colvin, No. 7:12 CV 522, 2013 WL 1500360, at *4 (N.D.N.Y. April 11, 2013) (noting determination "'must contain specific reasons for the finding on credibility . . . and must be sufficiently specific to make clear' the weight afforded 'and the reasons for that weight.'" (alteration in original) (quoting Notices of Social Security Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P, 61 Fed. Reg. 33483-01, 33484

(July 2, 1996))).

Moreover, "'[b]ecause the ALJ has the benefit of directly observing a claimant's demeanor and other indicia of credibility,' his decision to discredit subjective testimony is 'entitled to deference' and may not be disturbed on review if his disability determination is supported by substantial evidence." Felix, 2012 WL 3043203, at *8 (quoting Brown v. Astrue, No. 08 CV 3653, 2010 WL 2606477, at *6 (E.D.N.Y. June 22, 2010)); see Salmini v. Commissioner of Social Security, 371 F. App'x 109, 113 (2d Cir. 2010) ("Generally speaking, it is the function of the ALJ, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'" (quoting Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983))).

The ALJ's determination is supported by the record. First, the ALJ noted that the plaintiff appeared to prevaricate regarding whether Dr. Collins had a discussion with her about whether the doctor thought she was disabled. (R. at 29, 43-44). Ms. Stroud at first said, twice, that no such conversation had taken place. (R. at 43-44). However, when confronted with the progress notes from Ms. Stroud's January 19, 2012 examination, which state that Dr. Collins "informed her that [she] d[id] not deem her disabled" by diabetes mellitus, the plaintiff admitted that she had such a conversation. (R. at 44). It was reasonable for the ALJ to rely on this in making his credibility determination.

The ALJ also found Ms. Stroud's testimony regarding her back

pain and inability to sit not to be credible.  He noted during the hearing that Ms. Stroud had not sought treatment for such a complaint.  See Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989) (holding that claimant's failure to seek medical attention "seriously undermine[d]" contention of disability); Fitzgerald v. Astrue, No. 2:08 CV 170, 2009 WL 4571762, at *14 (D. Vt. Nov. 30, 2009) ("[T]he law allows ALJs to consider a claimant's failure to seek treatment during the insured period when weighing the claimant's credibility."); Mahoney v. Apfel, 48 F. Supp. 2d 237, 246 (E.D.N.Y. 1999) ("[T]he ALJ is permitted to attach significance to [the claimant's] failure to seek medical treatment.").

Finally, the plaintiff objects to the ALJ's consideration of her work history, which he found "extremely unimpressive."  (Pl. Memo. at 18; R. at 30).  Ms. Stroud notes that she worked as a phone operator for a number of years.  (Pl. Memo. at 18).  However, as the Commissioner points out, "she [] never earned more than $12,937.00 in any year, and during seven years of her adult life, [she] earned less than $10,000 per year.  (Reply at 13).  "A claimant's unexplained poor work history may negatively impact on the claimant's credibility."  Marine v. Barnhart, No. 00 Civ. 9392, 2003 WL 22434094, at *4 (S.D.N.Y. Oct. 24, 2003).  In considering such work history, it is appropriate to consider the claimant's earnings in combination with other relevant factors.  See id. at *3.  Here, Ms. Stroud's poor earnings records was considered along with other factors such as her apparent prevarication and her failure to seek treatment for a complaint she asserted affected her

functional capacity. (R. at 29-30). His credibility determination was supported by substantial evidence.[11]

Conclusion

For these reasons, I recommend denying the defendant's motion for judgment on the pleadings and granting the plaintiff's motion for judgment on the pleadings, vacating the Commissioner's decision denying the plaintiff benefits, and remanding the case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Analisa Torres, Room 2210, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE.

Dated: New York, New York
       August 18, 2014

---

[11] Because I recommend remanding the case to further develop the record, which may affect the Commissioner's analysis at step three, I need not address Ms. Stroud's final argument, that the ALJ erred at step four or step five of the sequential analysis. (Pl. Memo. at 18-20).

Copies mailed this date to:

Howard D. Olinsky, Esq.
Olinsky Law Group
300 South State Street., Suite 420
Syracuse, New York 13202

Susan D. Baird, Esq.
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY 10007